IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF MISSIOURI- EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | |
| v. | ) | |
| | ) | |
| MIDWEST BANKCENTRE | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

The United States of America alleges:

1.     This action is brought by the United States to enforce the provisions of the Fair Housing Act, 42 U.S.C. §§ 3601-3619, and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691f.

2.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1345, 42 U.S.C. § 3614, and 15 U.S.C. § 1691e(h).  Venue is appropriate pursuant to 28 U.S.C. § 1391.

3.     Defendant Midwest BankCentre ( "Midwest" or "Bank") is a wholly-owned subsidiary of Midwest BankCentre, Inc., a financial holding company headquartered in St. Louis County, Missouri. The Bank's principal office is in St. Louis County, Missouri.  Midwest offers the traditional services of a financial depository and lending institution, including the receipt of

monetary deposits and the financing of residential housing and commercial loans primarily in the St. Louis, Missouri metropolitan area.  As of December 31, 2009, Midwest had assets totaling just over $1.1 billion.  Midwest is subject to the regulatory authority of the Federal Reserve System.

4.     Midwest has seven full-service branches and four partial-service branches in the St. Louis, Missouri metropolitan area.  Midwest's full-service branches offer deposit products and services and loan products, including home-mortgage lending.  The four partial-service branches, which offer only deposit services, are located within retirement communities and are open only to residents of those retirement communities.  From March 2008, through September 2010, Midwest operated an additional full-service branch in Rockford, Illinois, approximately 350 miles from the City of St. Louis.

5.     Midwest's mortgage lending activities in the St. Louis metropolitan are almost exclusively confined to the Missouri portion of the St. Louis Metropolitan Statistical Area (MSA).  The Missouri portion of the St. Louis MSA is comprised of Crawford, Franklin, Jefferson, Lincoln, St. Charles, St. Louis and Warren counties as well as the City of St. Louis.

6.     Midwest is subject to the federal laws governing fair lending, including the Fair Housing Act and the Equal Credit Opportunity Act and their respective implementing regulations, the fair housing regulations of the Department of Housing and Urban Development, 24 C.F.R. § 100.1, *et seq.,* and Regulation B of the Board of Governors of the Federal Reserve System, 12 C.F.R. § 202.1, *et seq.*  The Fair Housing Act and the Equal Credit Opportunity Act prohibit financial institutions from, *inter alia,* discriminating on the basis of race and color in their home-mortgage lending practices.

7.      On August 14, 2009, the Department of Justice informed the defendant that it had initiated an investigation into potential lending discrimination by the Bank, including whether Midwest had discriminated on the basis of race in providing lending services to predominantly African-American communities in the St. Louis metropolitan area.  The Department of Justice's investigation stemmed from allegations of lending discrimination that the Metropolitan St. Louis Equal Housing Opportunity Council had brought to the attention of the Department earlier in 2009.

8.      Beginning in 2009, the Federal Reserve System initiated a consumer compliance examination of Midwest.  During the course of its examination, the Federal Reserve System analyzed lending data from 2006-2008 related to Midwest's applications and originations in the City of St. Louis and St. Louis, St. Charles and Jefferson Counties.  Based on the information gathered during its examination, the Federal Reserve concluded that there was reason to believe that Midwest engaged in a pattern or practice of discrimination in violation of the Equal Credit Opportunity Act and the Fair Housing Act.  Specifically, the Federal Reserve System determined that there was reason to believe that Midwest engaged in redlining in violation of Section 701(a) of the Equal Credit Opportunity Act and the Fair Housing Act, 42 U.S.C. § 3605(a).

9.      Pursuant to 15 U.S.C. § 1691e(g), the Board of Governors of the Federal Reserve System referred the matter to the Attorney General for appropriate enforcement action on October 14, 2010, following its determination as described in paragraph 8.

10.      According to the 2000 Census, the Missouri portion of the St. Louis MSA had a total population of approximately 2.03 million persons, of whom 76% were non-Hispanic white (approximately 1.53 million) and 19% were African-American (approximately 378,000).  The

MSA's African-American population is mostly concentrated in the northern part of the City of St. Louis and the neighboring northeastern portion of St. Louis County.

11.     In operating and expanding the scope of its business over time, defendant has acted to meet the credit needs for residential real estate-related loans in predominantly white residential census tracts (with a population greater than 50% white) in the Missouri portion of the St. Louis MSA, and has avoided serving the similar credit needs of majority-black census tracts.

12.     Defendant has engaged in a race-based pattern of locating branch offices. It has located branch offices in a manner designed to serve the banking and credit needs of the residents of majority-white census tracts, but not those of residents of majority-black census tracts.

13.     Since 1990, Midwest has opened or relocated six full-service branches in majority-white census tracts in the St. Louis MSA, and none in majority-black census tracts. Since 1995, Midwest opened its four partial-service branches in retirement communities with majority-white populations. At present, all seven of Midwest's full-service branches in the St. Louis area are located in majority-white census tracts. *See* Map attached as Exhibit A.

14.     In addition to its branches in the St. Louis MSA, in 2007, Midwest opened a loan production office in Rockford, Illinois that became a full-service branch in 2008. The population of the Rockford MSA is 85% white. Midwest closed its branch in Rockford, Illinois in late-2010.

15.     The unlawful consideration of race in the business practices of defendant is also evident from the assessment areas that defendant has established and maintained pursuant to the Community Reinvestment Act ("CRA"). Pursuant to statutory direction, the Board of Governors of the Federal Reserve System has promulgated regulations to implement the CRA, 12 C.F.R.

§ 228 ("Reg. BB").  Under Reg. BB, as amended in 1997, a bank's assessment area ordinarily

will consist of one or more metropolitan areas or contiguous political subdivisions, 12 C.F.R.

§ 228.41(c), unless that area would be extremely large, of unusual configuration, or divided by

significant geographic barriers, 12 C.F.R. § 228.41(d).  Reg. BB further provides that if a bank's

assessment area does not include entire political jurisdictions, its assessment area may not reflect

illegal discrimination.  12 C.F.R. § 228.41(e).

16.     Further, Midwest had delineated a CRA assessment area within the St. Louis

MSA that included most of St. Louis County, portions of St. Charles and St. Jefferson counties,

and the southern part of the City of St. Louis.  The assessment area excluded the northern part of

the City of St. Louis as well as the northeast corner of St. Louis County.  Midwest's assessment

area formed a virtual horseshoe around the majority-black census tracts in the City of St Louis.

*See* Map attached as Exhibit A.  Specifically, Midwest's CRA assessment area excluded 47 of

the 60 majority-black census tracts within the City of St Louis.  In 2010, following discussions

with the Federal Reserve System, Midwest modified its CRA assessment area to include the

entire City of St. Louis and all of St. Louis, St. Charles, and Jefferson Counties.

17.     Since at least 2004, Midwest knew or should have known that it was under-

serving majority-minority communities.  For three consecutive years beginning in 2004,

Midwest employed a consulting firm to analyze its HMDA data for compliance with CRA and

fair housing requirements.  Each of the resulting annual reports stated that Midwest was making

a lower portion of its HMDA-reportable loans in majority-minority census tracts than was its

peer group, which consisted of seven lenders apparently selected by Midwest and/or its

consultant, Phillips and Associates.  In 2004, Midwest was informed that while its peer group

had made 6.5% of its HMDA-reportable loans in minority census tracts, Midwest had made only

1.7% of its HMDA-reportable loans in those census tracts. In 2005, Midwest was informed that its peer group had made 7.8% of its HMDA-reportable loans in minority census tracts, while Midwest had made only 1.4% of such loans in those census tracts. In 2006, Midwest was informed that while its peer group had made 8.9% of its HMDA-reportable loans in minority census tracts, Midwest had made only 4.9% of its HMDA-reportable loans in those census tracts.

18.     Until at least late-2009, after being put on notice of the Department of Justice's investigation, Midwest took no affirmative steps to market its mortgage lending services to black borrowers or in majority-black census tracts.

19.     The policies and practices of defendant, described herein, have served majority-white communities to a significantly greater extent than majority-black communities, as further demonstrated by defendant's actual residential lending activity over time.

20.     Statistical analyses of the defendant's residential real estate-related loan applications and originations for each year from 2004 to 2008, and for the five years combined, show that the defendant served the credit needs of the residents of majority-white census tracts in the Missouri portion of the St. Louis MSA to a significantly greater extent than it served the residential real estate-related credit needs of the residents of majority-black census tracts. During that time, there were statistically significant disparities with respect the defendant's residential real estate lending activity when compared with similar lenders. Those disparities remained significant throughout the analyzed five-year period.

21.     From 2004-2008, the defendant generated 2,250 single-family (defined by HMDA as dwellings with 1-4 units) residential loan applications in the St. Louis MSA that were

required to be reported to its regulator pursuant to HMDA,[1] 28 U.S.C. §§ 2801-2810.  Only 61,

or 2.7%, of these applications were received from majority-black tracts.  During that same time

period, comparable lenders in the St. Louis MSA received 10.7% of their residential real estate-

related loan applications from majority-black census tracts – almost four times the rate of

Midwest applications.  These results show a statistically significant failure by Midwest to

provide loan services and draw applications from majority-black tracts on an equal basis with

majority-white census tracts.

  22. Of the 1,861 single-family residential loans Midwest originated in the St. Louis

MSA from 2004-2008, only 42 or 2.3% were secured by residential property located in majority-

black census tracts.  *See* Map of Originations, attached as Exhibit C.   In contrast, Midwest's

peer group lenders in the St. Louis MSA originated 113,084 single-family residential loans from

2004-2008, and 8.6% of those loans were secured by residential property located in majority-

black tracts.   These percentage figures are more than three times that of Midwest Bank, and

show a statistically significant failure by the defendant to provide loan services and draw

applications from majority-black tracts.

  23. The totality of defendant's policies and practices described herein constitutes the

redlining of majority-black areas of the St. Louis MSA for defendant's home lending business.

Defendant's policies and practices are intended to deny and discourage, or have the effect of

denying or discouraging, an equal opportunity to the residents of the majority-black

neighborhoods of the St. Louis MSA, on account of the racial composition of those

---

[1]  This includes all loan applications that Midwest reported on its HMDA reports, as well as loan applications that Midwest originated and forwarded to DAS or subprime lenders to be underwritten.  See Map of Applications, attached as Exhibit B, which illustrates the locations of the residential properties to be secured by these loan applications.

neighborhoods, to obtain residential real estate-related loans.  These policies and practices are

not justified by business necessity or legitimate business considerations.

      24.    Defendant's actions as alleged herein constitute:

      a.    Discrimination on the basis of race or color in making available, or in the terms or

conditions of residential real estate-related transactions, in violation of the Fair Housing Act, 42

U.S.C. § 3605(a);

      b.    The making unavailable or denial of dwellings to persons because of race or color

in violation of the Fair Housing Act, 42 U.S.C. § 3604(a);

      c.    Discrimination on the basis of race or color in the terms, conditions, or privileges

of the provision of services or facilities in connection with the sale or rental of dwellings, in

violation of the Fair Housing Act, 42 U.S.C. § 3604(b); and

      d.    Discrimination against applicants with respect to credit transactions, on the basis

of race or color, in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a)(1).

      25.    Defendant's policies and practices as alleged herein constitute:

      a.    A pattern or practice of resistance to the full enjoyment of rights secured by the

Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, and the Equal Credit Opportunity Act, 15 U.S.C.

§ 1691e(h); and

      b.    A denial of rights granted by the Fair Housing Act to a group of persons that

raises an issue of general public importance.

      26.    Persons who have been victims of defendant's discriminatory policies and

practices are aggrieved persons as defined in 42 U.S.C. § 3602(i) and as described in the Equal

Credit Opportunity Act, 15 U.S.C. § 1691(e)(i), and have suffered damages as a result of

defendant's conduct in violation of both the Fair Housing and the Equal Credit Opportunity Acts, as described herein.

27.     The discriminatory policies and practices of defendant have been intentional and willful, and implemented with reckless disregard for the rights of African-American borrowers.

WHEREFORE, the United States prays that the Court enter an ORDER that:

(1)     Declares that the policies and practices of defendant constitute a violation of the Fair Housing Act and the Equal Credit Opportunity Act;

(2)     Enjoins defendant, its agents, employees, and successors, and all other persons in active concert or participation with defendant, from:

(A)     Discriminating on account of race or color in any aspect of their lending business practices;

(B)     Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of defendant's unlawful practices to the position they would be in but for the discriminatory conduct;

(C)     Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of defendant's unlawful practices, and providing policies and procedures to ensure all segments of defendant's market areas are served without regard to prohibited characteristics;

(3)     Awards monetary damages to all the victims of defendant's discriminatory policies and practices for the injuries caused by defendant, pursuant to 42 U.S.C. § 3614(d)(1)(B) and 15 U.S.C. § 1691e(h); and

(4)     Assesses a civil penalty against defendant in an amount authorized by 42

U.S.C. § 3614(d)(1)(C), in order to vindicate the public interest.

The United States further prays for such additional relief as the interests of justice may require.

Dated: June 16, 2011

Respectfully submitted,

RICHARD G. CALLAHAN
United States Attorney

ERIC HOLDER
Attorney General

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

STEVEN H. ROSENBAUM
Chief, Housing and Civil Enforcement
Section
Civil Rights Division

JANE RUND  #47298
Assistant United States Attorney
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 20.333
St. Louis, MO 63102
Phone: (314) 539-2200
Fax: (314) 539-2309

DONNA M. MURPHY
Deputy Chief
SARA NILES
Attorney
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Northwestern Building, 7th Floor
Washington, D.C. 20530
Phone: (202) 514-2168
Fax: (202) 514-1116
Sara.Niles@usdoj.gov